Alys CAVINESS, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security,[1] Defendant.

No. IP 97–945–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 22, 1998.

---

**1.** Pursuant to Federal Rule of Civil Procedure 25(d)(1), current Commissioner of Social Security, Kenneth S. Apfel, has been substituted for former Acting Commissioner John J. Callahan as the defendant in this action.

Philip J. Caviness, Holt, Fleck & Free, Noblesville, IN, for Plaintiff.

Gerald A. Coraz, Office of U.S. Atty., Indianapolis, IN, for Defendant.

## ENTRY ON JUDICIAL REVIEW

HAMILTON, District Judge.

This is an action for judicial review of the decision of the Commissioner of Social Security to deny plaintiff Alys Caviness's application for disability insurance benefits and supplemental security income. After finding that Ms. Caviness suffers from severe impairments but is capable of substantial gainful activity, an Administrative Law Judge (ALJ) denied her claim. The Appeals Council denied review leaving the ALJ's determination as the final decision of the Commissioner. As explained below, the ALJ's decision must be vacated and remanded. Even under the deferential standard of judicial review that applies to such decisions under the Social Security Act, the ALJ's decision is not supported by substantial evidence.

### Background

Alys Caviness was born on June 20, 1963, and was 31 years old when she applied for benefits in May 1995. She has completed high school and some college. At the time of the hearing before the ALJ, Ms. Caviness was taking courses as a junior at Ball State University in Muncie, Indiana. She has past relevant work as a proof-reader, a receptionist, a collections specialist, a data clerk, a manager, and a sales clerk. She claims she has been disabled since April 1991 because of severe chronic bronchiectasis and chronic sinusitis. She has suffered from these conditions since childhood, and they have caused repeated lung infections, fatigue, shortness of breath, coughing and neck strain. The ALJ found that Ms. Caviness suffers from medically severe impairments but that she remains capable of substantial gainful activity at the light exertional level with additional non-exertional environmental restrictions because she needs clean air. Ms. Caviness challenges the ALJ's finding that her impairments do not meet or equal one of the automatically disabling impairments listed in the Social Security Administration regulations, his determination about the credibility of her complaints, his decision not to give controlling weight to the opinion of her treating physician, and his finding that she can perform a significant number of jobs in the economy.

### Standard of Review

The Social Security Act provides that if the findings of the Commissioner are supported by substantial evidence, they are conclusive as to a claimant's eligibility for the benefits in question here. 42 U.S.C. §§ 405(g), 1383(c)(3); *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir.1997). When the Appeals Council finds no basis for further review, as it did here, the ALJ's findings are treated as those of the Commissioner. *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir.1994). The court reviews the ALJ's findings to de-

termine whether they are supported by substantial evidence in the record as a whole. *Perkins,* 107 F.3d at 1296. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brewer v. Chater,* 103 F.3d 1384, 1390 (7th Cir.1997), quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). If substantial evidence in the record supports the Commissioner's (here, the ALJ's) findings, the court must affirm the decision unless the Commissioner committed an error of law. *Nelson v. Apfel,* 131 F.3d 1228, 1234 (7th Cir.1997); *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

 The courts are not to attempt to determine whether the plaintiff is actually disabled. *Books v. Chater,* 91 F.3d 972, 977 (7th Cir.1996). The Commissioner or his designate, the ALJ, is responsible for weighing the evidence, resolving material conflicts, making independent findings of fact, and deciding the case accordingly. See *Perales,* 402 U.S. at 399–400, 91 S.Ct. 1420; *Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir.1986). The court may not decide facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson,* 131 F.3d at 1234. The court must not, however, simply rubber-stamp the decision without critically reviewing the evidence as a whole. *Howell v. Sullivan,* 950 F.2d 343, 347 (7th Cir.1991). In considering the record as a whole, the court must look at all the relevant evidence, not only the evidence that supports the Commissioner's conclusion. *Nelson,* 131 F.3d at 1237. The court must therefore consider "whatever in the record fairly detracts from [the] weight" of the Commissioner's determination. *Bauzo v. Bowen,* 803 F.2d 917, 923 (7th Cir.1986). Nevertheless, where "conflicting evidence allows reasonable minds to differ," the court must defer to the Commissioner's resolution of that conflict. *Binion,* 108 F.3d at 782.

### Discussion

To be eligible for benefits, Ms. Caviness must establish that she suffers from a disability within the meaning of the Social Security Act. The Act defines "disability" as an inability to engage in substantial gainful activity by reason of a medically determinable impairment that can be expected to last for twelve continuous months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Ms. Caviness is disabled only if her impairments are of such severity that she is unable to perform work that she has done previously and if, based on her age, education, and work experience, she could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work is actually available to her. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). This standard is a stringent one. A claimant is not necessarily entitled to benefits even if he or she has substantial impairments. These benefits are paid for with taxes, including taxes paid by many people who work despite serious physical or mental impairments and for whom working is quite difficult and painful. Before tax dollars are available to support someone applying for benefits, it must be clear that the claimant has a severe impairment and cannot perform virtually any kind of work. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler,* 766 F.2d 284, 285 (7th Cir.1985). Also, unlike many private disability insurance policies, a person may not be disabled under the Act even if she is no longer able to perform her past work or the work she feels is most suitable in terms of her skills, education, and experience. Under this statutory standard, these benefits are available only as a matter of nearly last resort.

 The ALJ followed the familiar five-step analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920 to determine whether Ms. Caviness is disabled. The steps are as follows:

(1) Is the claimant engaging in substantial gainful activity? If so, he or she is not disabled.

(2) If not, does the claimant have an impairment or combination of impairments that are severe? If not, he or she is not disabled.

(3) If so, does the impairment(s) meet or equal a listed impairment in the appen-

dix to the regulations? If so, the claimant is disabled.

(4) If not, can the claimant do his or her past relevant work? If so, he or she is not disabled.

(5) If not, can the claimant perform other work given his or her residual functional capacity, age, education, and experience? If so, then he or she is not disabled. If not, he or she is disabled.

See generally 20 C.F.R. §§ 404.1520, 416.920. The burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step if the analysis proceeds that far. *Brewer v. Chater,* 103 F.3d at 1391; *Young v. Secretary of Health and Human Services,* 957 F.2d 386, 389 (7th Cir.1992).

At step one of the analysis, the ALJ found no evidence that Ms. Caviness has engaged in substantial gainful activity since her alleged onset date of April 15, 1991. At step two, the ALJ found that her impairments significantly limit her ability to perform basic work activities and are therefore "severe." At step three, however, the ALJ found that Ms. Caviness's impairments do not meet or equal in severity any of the automatically disabling impairments listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1. At steps four and five, the ALJ determined her residual functional capacity (RFC), finding that Ms. Caviness is capable of work at the light exertional level but that she must avoid excessive exposure to dust, fumes, smoke, allergens, pollen, animal hair, extremes of temperature or humidity, and that she is limited to working in a clean air environment. The ALJ therefore found that Ms. Caviness is unable to perform her past relevant work but that she can perform a significant number of jobs in the economy, including cashier, information clerk, ticket agent, order clerk, file clerk, and telemarketer. Accordingly, the ALJ concluded that she is not disabled. R. 35–36.

## A. *The ALJ's Step–Three Finding*

■ Ms. Caviness first challenges the ALJ's finding that her impairments do not meet or equal in severity any of the automatically disabling impairments listed in the regulations at 20 C.F.R., Pt. 404, Subpt. P, App. 1. Disabling bronchiectasis is defined in the

regulations at Listing 3.07, which requires that the condition be demonstrated by "appropriate imaging techniques" and further requires:

A. Impairment of pulmonary function due to extensive disease. Evaluate under the appropriate criteria in 3.02;

Or

B. Episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum) or respiratory failure (documented according to 3.00C), requiring physician intervention, occurring at least once every 2 months or at least six times in a year. Each inpatient hospitalization for longer than 24 hours for treatment counts as two episodes, and an evaluation of at least 12 consecutive months must be used to determine the frequency of the episodes.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.07. The ALJ found that Ms. Caviness's impairment does not meet or equal the listing because the record failed to support her testimony that her condition causes her to get pneumonia once or twice a month with each episode lasting three or more days. R. 33. The ALJ also noted medical records indicating that none of the episodes she reported in October 1993 had required hospitalization or progressed to pneumonia. R. 33, 192. Overall, the ALJ found that her "bronchiectasis is not accompanied by documented symptomatic episodes lasting one or more days and requiring intensive treatment as required under Section 3.07." R. 29.

Ms. Caviness relies on the definition of disabling bronchiectasis in Listing 3.07(B). She argues that her condition meets or equals that definition under paragraph (B). She asserts that she sustained four lung infections in a period of less than six months beginning in the fall of 1995 through February 1996 and that required "physician intervention" in the form of a monthly regimen of antibiotics, prescribed by her treating physician on an annual or semi-annual basis, including ten days of a "maintenance" dosage at the beginning of each month and extra dosages as needed to combat "flare ups" or infections. The Commissioner replies that her condition does not meet or equal para-

graph (B) because, even if Ms. Caviness did have four lung infections in that six month period, those infections did not constitute "episodes of bronchitis or pneumonia or hemoptysis" as defined by Listing 3.00(C), which is incorporated into Listing 3.07(B). Listing 3.00(C) provides in relevant part:

Attacks of asthma, episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum), or respiratory failure as referred to in paragraph B of 3.03, 3.04, and 3.07, are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator *or* antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence *must also include* information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.00(C) (emphasis added). There is no evidence in the record that Ms. Caviness has been hospitalized or given intravenous treatment for her condition since 1988. R. 88. She argues here, however, that the examples of "intensive treatment" in Listing 3.00(C) including "intravenous bronchodilator *or* antibiotic administration" should be interpreted as applying to any form of antibiotic administration (whether oral or intravenous) or, alternatively, intravenous bronchodilator administration. She argues that her monthly regimen of oral maintenance antibiotics in combination with extra dosages as needed to combat infections qualifies as intensive treatment. The Commissioner contends that antibiotics must be administered intravenously to be intensive treatment of the type contemplated by the Listings.

■ The court finds that substantial evidence in the record supports the ALJ's finding that Ms. Caviness's impairment does not meet or equal Listing 3.07. The Listings are designed to streamline the benefit determination analysis by identifying those "impairments that would prevent an adult,

regardless of [her] age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Thus, the medical criteria defining the listed impairments are deliberately set at a higher level of severity than is required by the Social Security Act for a condition to be disabling. *Id.* If a claimant's impairment does not meet a listed impairment, the Commissioner (here the ALJ) must undertake further inquiry to determine whether, in light of the claimant's functional capacity, age, experience, and education, she retains the ability to work. *Id.* Because the Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively. Moreover, although "no easy formula dictates the extent to which an impairment can deviate from the Listings' exact terms and still be deemed equivalent," failure by the claimant to demonstrate listed criteria is often a "justifiable basis and substantial evidence" to support an ALJ's conclusion that the claimant's impairment does not meet or equal a listing. *Sample v. Shalala,* 999 F.2d 1138, 1142 (7th Cir.1993).

With regard to Listing 3.07 in particular, the court concludes that self-treatment with prescribed oral antibiotics does not equal the intensive treatment contemplated by 3.00(C). Ms. Caviness's interpretation of Listing 3.00(C) would elevate what appears to be a fairly common treatment for chronic bronchiectasis to "intensive treatment." See R. 240 ("Med Facts" on bronchiectasis from the National Jewish Center for Immunology and Respiratory Medicine, cited by Ms. Caviness, Pl. Br. at 14, as authority on accepted symptoms of bronchiectasis). Moreover, Listing 3.00(C) requires adherence to a prescribed course of treatment such as the antibiotics taken regularly by Ms. Caviness as an additional independent criterion for finding that episodes such as those Ms. Caviness alleges are sufficiently severe. Accordingly, the ALJ could reasonably find that Ms. Caviness does not suffer episodes of bronchitis or pneumonia severe enough to support an automatic finding of disability under Listing 3.07.

Ms. Caviness also contends that the ALJ did not rely on the language of Listing 3.00(C) in his decision and that he erroneously cited her inconsistent treatment as a reason for finding that she did not meet Listing 3.07. The ALJ's opinion shows clearly that he considered the language of Listing 3.00(C) in making his step-three determination even though he did not cite that definition specifically. In concluding that Ms. Caviness's impairment does not meet or equal Listing 3.07, the ALJ found that the record did not establish that she had a history of symptomatic "episodes lasting one or more days" and requiring "intensive treatment." The quoted phrases do not appear in Listing 3.07 itself, but only in Listing 3.00(C). The court is satisfied that the ALJ applied the correct legal standard in considering Ms. Caviness's impairment at step three. Finally, the ALJ did not err by citing Ms. Caviness's lack of treatment as undermining her claim that her impairment is automatically disabling under Listing 3.07. Both Listing 3.07 and Listing 3.00(C) require intervention by health care providers. Ms. Caviness cites case authority (discussed below) for the proposition that the ALJ may not hold lack of treatment against a claimant who cannot afford it in determining severity at step two or in assessing a claimant's credibility at steps four and five. None of those cases hold, and the court is aware of no other cases holding, that the ALJ may not consider lack of treatment for any reason at step three when the relevant listing specifically requires medical intervention. As noted above, the Listings are intended to identify only those conditions that are clearly disabling, and many Listings therefore require clear, documented evidence of substantial medical intervention before a claimant can be found disabled at step three. The ALJ did not err by finding that Ms. Caviness's impairment does not meet or equal any of the automatically disabling impairments listed in the regulations. The court therefore turns to the more specific consideration of Ms. Caviness's condition at steps four and five of the analysis.

## B. *The ALJ's Credibility Determination*

As in many disability cases, the heart of the ALJ's decision denying benefits was his decision to discount to a significant extent Ms. Caviness's own testimony about the severity of her impairments. The Social Security regulations provide that in making the disability determination, the Commissioner will consider a claimant's statements about his or her symptoms and how they affect the claimant's daily life and ability to work. 20 C.F.R. §§ 404.1529(a), 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability, however. *Id.* The Social Security regulations set forth a two-part test for determining whether complaints of pain contribute to a finding of disability. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged. 20 C.F.R. §§ 404.1529(a) & (b), 416.929(a) & (b). Second, once the ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of those symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c).

Objective medical evidence is not necessary to support allegations of the extent of claimed symptoms, but neither the ALJ nor this court is "required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work." *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir.1996); *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993). Accord, 20 C.F.R. §§ 404.1529(d), 416.929(d). The ALJ must weigh the claimant's subjective complaints and the relevant medical evidence, as well as any other evidence of the following factors:

(1) The claimant's daily activities;

(2) Location, duration, frequency, and intensity of pain or other symptoms;

(3) Precipitating and aggravating factors;

(4) Type, dosage, effectiveness, and side effects of any medication;

(5) Treatment, other than medication, for relief of pain or other symptoms;

(6) Other measures taken to relieve pain or other symptoms;

(7) Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Having considered these factors, which are intended to either corroborate or discredit the claimant's subjective complaints, the ALJ may make a reasoned credibility determination based upon the evidence about whether the claimant acts, day in and day out, like a person would act who is really suffering from the symptoms the claimant alleges. The court will not set aside an ALJ's credibility determination if there is some support in the record unless it is "patently wrong." *Luna v. Shalala*, 22 F.3d at 690; *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994). This deference to an ALJ's credibility determination is especially justified when it "involves inarticulable elements 'that leave no trace that can be discerned in this or any other transcript.'" *Herron*, 19 F.3d at 335, quoting *Ehrhart v. Secretary of Health and Human Servs.*, 969 F.2d 534, 541 (7th Cir.1992). "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron*, 19 F.3d at 335, citing *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

At her hearing, Ms. Caviness testified that the symptoms she experiences on a normal day include congestion, wheezing, coughing, headaches, dizziness, fatigue, pain in her lungs, and neck and back strain from coughing. R. 86. She also testified that she gets pneumonia or a "flare-up" once or twice a month on average, with each episode lasting from a few days to a couple of weeks. R. 89. Her symptoms during an episode of pneumonia include very high fever, terrible pain in her lungs, shallow and painful breathing, vision problems, vomiting, and occasional diarrhea. R. 90. During such an episode, she finds it difficult even to get out of bed and take care of her children. *Id.* She also testified that she thinks that her condition has worsened over time and that she has "flare-ups" more often than she used to. R. 92. Ms. Caviness has a fairly extensive work record, but she testified that she has lost many jobs because her health problems have caused her work attendance to be erratic. R. 54, 80, 81, 83. That point was confirmed by her most recent employer. R. 237–38. Ms. Caviness testified that she takes prescription antibiotics for the first ten days of every month and more as needed to treat a "flare-up" or lung infection. R. 62. The antibiotics usually work to suppress an infection, but side effects include nausea, dizziness and severe headaches. R. 63–64.

The ALJ considered the factors described above in determining the weight to give Ms. Caviness's account of her symptoms and found her subjective complaints "not fully credible." R. 32. In making this credibility determination the ALJ said the "most significant" factor was Ms. Caviness's failure to obtain regular treatment for her bronchiectasis. R. 31. By "regular treatment" it is apparent that the ALJ meant direct, in-person treatment by a physician, for he did not discredit her claim that she takes antibiotics as she described. R. 32. Nevertheless, despite Ms. Caviness's uncontradicted testimony that she takes additional or different antibiotics when she has a "flare-up," the ALJ found that there is "no evidence of significant increases in these medications reflective of uncontrolled symptoms." *Id.* Ms. Caviness testified that she had stopped using Ventolin inhalers because they had little effect on her symptoms and because she could not afford them. R. 74. The ALJ found that action was inconsistent with her claim that her condition has grown worse over time, and he noted that the record fails to show that Ms. Caviness uses any type of pain medication despite her claim of debilitating pain. R. 32.

Many courts, including the Seventh Circuit, have questioned the relevance of a claimant's failure to seek medical treatment, especially when he or she is unable to afford it. See, *e.g., Herron v. Shalala*, 19 F.3d at 336 & n. 11 ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits."), citing *DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir.1989); *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir.1989) (ALJ should consider in first instance whether lack of financial resources is claimant's motivation

for failing to seek medical attention); *Lovejoy v. Heckler,* 790 F.2d 1114, 1117 (4th Cir.1986) (discrediting claimant's complaints of disabling pain was erroneous where claimant's testimony that she could not afford further treatment was uncontradicted by the record). In *Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir.1993), the Tenth Circuit identified four factors that an ALJ should consider before using a claimant's failure to pursue treatment to discount the claimant's subjective complaints:

(1) whether the treatment at issue would restore claimant's ability to work;

(2) whether the treatment was prescribed;

(3) whether the treatment was refused; and if so,

(4) whether the refusal was without justifiable excuse.

987 F.2d at 1490.[2] In reversing the district court and remanding the case in *Thompson,* the Tenth Circuit pointed out that there was no evidence in the record that the medication the claimant had failed to take was effective, nor had the ALJ considered the claimant's claim that she could not afford to continue using her medication or seek further treatment from her doctor. *Thompson,* 987 F.2d at 1486, 1490.

Similarly, in this case the ALJ's opinion suggests that he ignored much of Ms. Caviness's testimony at the hearing. In finding her subjective complaints not credible, he relied heavily on her failure to seek regular, direct, in-person care by a physician and her failure to use Ventolin inhalers. At the hearing, Ms. Caviness testified extensively about her financial situation. She is a divorced mother of two young children, her ex-husband was over $5,000 in arrears on his weekly child support payments of $130 at the time of the hearing, and her ex-husband also had not made any of his additional monthly $200 maintenance payments to her. She also testified that she receives a Pell grant of $3,225 and Stafford loans for school, that she receives food stamps, that the local housing authority pays her rent, that she makes about $40 per month from selling Avon products to her family and friends, and that her only assets were $883 in a checking account and a ten year old automobile. R. 57–61. Ms. Caviness testified that she stopped using a Ventolin inhaler because it was not helping much and she could no longer afford it. R. 74. She also testified that she would like to see her doctor at least every three months but that she cannot afford to see him more than once a year to renew her prescriptions for antibiotics. R. 88. The ALJ did not even mention Ms. Caviness's financial situation, much less its effect on her ability to pursue regular medical treatment, the absence of which he said was the "most significant" factor in discounting her credibility.[3] Moreover, there is no evidence in the record that regular visits to a doctor would significantly alleviate or prevent the daily or episodic symptoms described by Ms. Caviness.[4]

The ALJ next pointed to Ms. Caviness's "wide variety of activities" in discrediting her complaints. He cited her status as a "full-time" student at Ball State University with a 3.25 grade point average as inconsistent with her claimed exertional and non-exertional limitations. R. 32.[5] At the time of the hearing Ms. Caviness was taking twelve credit

**2.** The Seventh Circuit cited these factors with apparent approval in *Herron v. Shalala.* 19 F.3d at 336 n. 11.

**3.** The Commissioner argues that a hospital could not have refused treatment to Ms. Caviness despite her inability to pay. Def. Br. at 6–7. A claimant is not required to run up bills she cannot pay and incur the wrath of debt collectors, or take ineffective medicine she cannot afford. merely to maintain her credibility with an ALJ. In other words, it is not reasonable to discredit Ms. Caviness's testimony merely because she failed to act unreasonably.

**4.** The ALJ also discredited Ms. Caviness's complaints of pain because the record does not dis-

close that she takes any type of pain medication. However, the ALJ never asked Ms. Caviness if she takes pain medication. More important, he apparently ignored records submitted by Dr. Ron Cargioli, Ms. Caviness's chiropractor. R. 178–83. Dr. Cargioli specifically reported that Ms. Caviness suffers from intermittent neck and thoracic spine pain resulting from her chronic lung condition. R. 189.

**5.** The ALJ noted that Ms. Caviness's grade point average was 3.25. The hearing transcript shows 3.75, but the difference is immaterial for the court's purposes. R. 53.

hours—enough to qualify as a full-time student. The ALJ did not mention, however, that she was taking only two of her classes on campus and the other two by correspondence. R. 52–53. He also did not address her frequent absences and her professors' willingness to allow her to make-up for them, which provides a degree of flexibility few employers could match. See R. 77. The ALJ noted that Ms. Caviness is able to leave her home to visit family and friends, but he failed to mention that most visits occur at her home and that she takes her children to a friend's house only every couple of weeks. R. 32, 71–72.

In another critical part of his opinion, the ALJ also cited Ms. Caviness's ability to care for her children and to perform household chores such as grocery shopping, cooking, washing dishes, vacuuming, laundry and changing beds as inconsistent with her subjective complaints. The ALJ failed to acknowledge, however, that Ms. Caviness is not claiming that her subjective symptoms are consistently so severe that she is incapacitated every day. Although she testified that she is able to perform such tasks, she also distinguished the severity of the symptoms of her disease on a normal day from those she experiences when she has a "flare-up" or lung infection. R. 86–90, 94. Ms. Caviness testified that when she periodically has a flare-up, she has difficulty doing anything, including getting out of bed, and that she needs to hold onto something even to walk. R. 90, 94. The evidence shows that when Ms. Caviness is *not* having "flare ups"—periodic and severe lung infections—she is able to work and has worked despite significant impairments and pain. The problem is that the ALJ failed to differentiate between her condition during these severe infections and her condition at other times. Ms. Caviness is not claiming she can never work. She is claiming, and has offered evidence to support, that her poor health requires frequent absences that make it impossible for her to keep a full-time job. The ALJ did not address this episodic nature of Ms. Caviness's complaints, but instead viewed her activities when she is at her healthiest as inconsistent with her complaints of incapacitating symptoms when she has a flare-up.

Finally, the ALJ also failed to discuss Ms. Caviness's extensive testimony regarding her work history in relation to her credibility. Ms. Caviness testified that she has worked fairly consistently since she first went to college through her job as a proof-reader immediately before returning to college in 1995.[6] Moreover, she testified that she lost many of those jobs because of her excessive absenteeism caused by her illness. R. 64, 78, 80–81, 83. Diana Dean, Ms. Caviness's direct supervisor at her last place of employment, confirms that Ms. Caviness had to leave full-time employment because of her health problems. R. 238.

To determine whether there is substantial evidence to support the ALJ's decision, the court looks to the ALJ's findings and order. The ALJ's opinion is important because it indicates whether the ALJ has considered all the evidence. *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985) ("The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence . . . ."). The ALJ must articulate, at least at some minimum level, his analysis of the evidence to allow the reviewing court to trace the path of his reasoning and to " 'be assured that the ALJ considered the important evidence.' " *Diaz v. Chater,* 55 F.3d 300, 307–08 (7th Cir.1995), quoting *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir.1995). This does not mean that the ALJ must provide a written evaluation of every piece of testimony and every submitted medical record. *Diaz,* 55 F.3d at 308. On the other hand, an ALJ's failure to discuss an entire line of evidence does not meet the minimal level of articulation required. *Green,* 51 F.3d at 101. A decision is not supported by substantial evidence where the ALJ fails to "grapple with significant record evidence." *Id.* at 102. In *Stein v. Sullivan,* the Seventh Circuit explained: "The [ALJ] may not select only that evidence that favors his ultimate conclusion; rather, he must articulate at some minimum level his analysis of the evidence in cases in which considerable evidence is presented to counter

---

**6.** Ms. Caviness apparently left college in 1987 and returned in the fall of 1995. R. 53.

the agency's position." 892 F.2d 43, 47 (7th Cir.1989), quoting *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir.1988). The fact that the evidence was conflicting and that the ALJ resolved the conflicting evidence against Ms. Caviness is not alone grounds for reversing the Commissioner's final decision. *Binion v. Chater*, 108 F.3d at 782. It is the ALJ's duty to weigh the evidence and resolve material conflicts. Here, however, the ALJ did not mention significant evidence supporting Ms. Caviness's credibility, and it is not apparent from the opinion that his decision was "based on fair consideration of all of the evidence presented." *Stein*, 892 F.2d at 47. It is impossible to know whether the ALJ believed Ms. Caviness was lying about her work history, financial condition, and the severity and episodic nature symptoms, or whether he simply failed to consider the evidence supporting her credibility. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant.

■ As noted above, the court will not set aside the ALJ's credibility determination unless it is patently wrong. Nevertheless, the court must critically review the evidence as a whole and must set aside the ALJ's decision if his findings of fact are unreliable because of serious mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir.1996). The court also must probe any mischaracterizations of evidence by the ALJ. See, *e.g.*, *Sarchet*, 78 F.3d at 307. The ALJ failed to discuss a great deal of significant evidence and mischaracterized other evidence relevant to the credibility of Ms. Caviness's subjective complaints. Given the weight the ALJ apparently gave Ms. Caviness's failure to pursue regular direct treatment by a physician, the court cannot be certain that the ALJ, or any other reasonable trier of fact, similarly would have discounted her credibility upon a full consideration of all of the relevant evidence. Too many of the ALJ's reasons for discrediting Ms. Caviness's subjective complaints are based on mischaracterizations or an incomplete discussion of the evidence for the court to be satisfied that a reasonable trier of fact would have come to the same conclusion if the evidence had been analyzed accurately.

Accordingly, the ALJ's credibility determination must be set aside as "patently wrong." Because Ms. Caviness's complaints that she experiences frequent incapacitating flare-ups of her symptoms and lung infections, if credited, might well have resulted in a finding that she is disabled, the case must be remanded for further consideration.

### C. The Opinion of Ms. Caviness's Treating Physician

■ Ms. Caviness also argues that the ALJ erred by not giving controlling weight to the opinion of her treating physician, Dr. Ramon Dunkin. No physician in this case has ever undertaken to completely evaluate Ms. Caviness's residual functional capacity. Ms. Caviness did not present such evidence from Dr. Dunkin or any other physician, and neither she nor the ALJ suggested a consultative examination to supplement the record. Dr. Dunkin's disputed opinion is recorded in a treatment noted dated June 9, 1995, ten days after Ms. Caviness applied for benefits. After noting that it had been two years since he last saw Ms. Caviness and reviewing her subjective complaints and physical signs (many of which were normal), Dr. Dunkin noted, "Alys appears to continue to have problems with bilateral bronchiectasis, probably not amenable to surgery. It is unlikely that she is going to be able to work in view of the chronic symptoms and recurring infections." R. 190. The ALJ decided that Dr. Dunkin's report should be given little weight because it was not supported by his own treatment notes, other objective medical evidence in the record, or laboratory and clinical findings. Moreover, the ALJ noted that in the same report, Dr. Dunkin wrote that Ms. Caviness "is not working and has been notified that she qualifies for social security." R. 32–33.

■ The law does not require an ALJ to afford controlling weight to a treating physician's opinion in every case. As the Seventh Circuit has explained, a patient's regular physician sometimes may want to do a favor for someone who is a friend and client, and may too quickly find disability. See *Books v. Chater*, 91 F.3d 972, 979 (7th Cir.1996); *Ste-*

*phens,* 766 F.2d at 289. The ALJ must weigh conflicting medical evidence and decide which opinions are entitled to the greatest weight. Social Security regulations confirm that the ALJ has discretion to weigh conflicting medical opinions. See 20 C.F .R. §§ 404.1527, 416.927. In some circumstances, the treating physician's opinion should be given controlling weight, but those circumstances are not present here:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Here, the ALJ found that Dr. Dunkin's assessment of Ms. Caviness's limitations was not supported by his own treatment notes and clinical and other substantial evidence in the record and therefore should not be given controlling weight. R. 33. Although it is true that the ALJ must give substantial weight to the medical opinions submitted, an opinion may be discounted if it is internally inconsistent or inconsistent with other evidence. *Knight v. Chater,* 55 F.3d 309, 314 (7th Cir.1995), citing *Cutlip v. Secretary of Health & Human Servs.,* 25 F.3d 284, 287 (6th Cir.1994) (per curiam) ("[T]reating physician's opinions ... are only accorded great weight when they are supported by sufficient clinical findings."); 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4). In June 1995, Dr. Dunkin noted that although Ms. Caviness had recurring bronchopulmonary infections, her monthly regimen of antibiotics seemed to "at least keep down the acute flare-ups." R. 190. Similarly, Dr. Dunkin had noted in 1993 that Ms. Caviness was "getting along fairly well with her bronchiectasis" and that her monthly regimen of antibiotics was controlling her "exacerbations" fairly well. R. 192. He noted in July 1990 that Ms. Caviness was experiencing breathlessness and fatigability, but he attributed any exacerbation of her symptoms to the fact that she was then pregnant. R. 194. In March 1990, Dr. Dunkin reported that Ms. Caviness's bronchiectasis had been fairly well controlled with antibiotic therapy. R. 196. There are no clinical findings since 1988 that clearly support Dr. Dunkin's conclusory assessment in 1995 that Ms. Caviness is unable to work. See R. 204–06.

The regulations set forth a number of factors to consider when deciding what weight to give a treating physician's opinion. These include the length of relationship and frequency of examination; the nature and extent of the treatment relationship; support from medical signs and laboratory findings; consistency with the record as a whole; and the degree of specialization by the treating physician. 20 C.F.R. §§ 404.1527(d)(2)—(d)(5), 416.927(d)(2)—(d)(5). Several of these factors weigh in favor of giving substantial weight to Dr. Dunkin's conclusion. He is a pulmonary specialist who has been Ms. Caviness's treating physician since 1988, and his conclusion is not inconsistent with the record as a whole. However, the other factors do not support giving his conclusion controlling weight. Although he has been her treating physician since 1988, the record reveals only six visits to him between 1988 and June 1995, and his assessment of disability is not clearly supported by recent objective clinical findings. Accordingly, it was not error for the ALJ to decline to give controlling weight to Dr. Dunkin's conclusion in 1995.

## D. *The ALJ's Step–Five Finding*

Ms. Caviness's final challenge is to the ALJ's finding at step five of the analysis. At the hearing, the ALJ posed a hypothetical to a vocational expert, Thomas Roundtree, assuming that Ms. Caviness was restricted to work at the light exertional level in a clean air environment without exposure to extremes of temperature. Mr. Roundtree testified that there are a significant number of jobs in the economy that a person with such abilities could perform, including cashier, receptionist, order clerk, customer service clerk, information clerk, secretary, file clerk, collection specialist, ticket agent, and telemarketer. R. 100–06. When asked by Ms. Caviness's representative to take into account a person who missed work three or four days each month, Mr. Roundtree testified that it would be difficult for that person

to hold any of the jobs he previously had identified and that most such jobs have a 90–day probationary period during which a new employee would likely be fired for missing more than one day of work. R. 106–08. He specifically noted that there is even less leeway for absenteeism in light assembly or similar jobs. R. 108. Ms. Caviness challenges the ALJ's use of Mr. Roundtree's testimony, arguing that the ALJ did not describe all of her limitations to him. Specifically, Ms. Caviness argues that the ALJ neglected to mention her absenteeism and that when asked to consider her absenteeism, Mr. Roundtree testified in her favor.

In *Ehrhart v. Secretary of Health & Human Servs.*, the Seventh Circuit affirmed an ALJ's denial decision even though the ALJ's hypothetical question did not incorporate all of the claimant's alleged impairments. 969 F.2d 534 (7th Cir.1992). In reaching that decision, the Seventh Circuit provided three alternative bases. First, although a vocational expert provided testimony at the hearing, the ALJ's decision indicated reliance on the Medical–Vocational Guidelines in the regulations when making the "not disabled" determination. *Id.* at 540. "Although the vocational expert testimony provided specific information on the number of available jobs suitable for [the claimant], it served mostly to reinforce the ALJ's finding of no disability." *Id.* Second, even if the ALJ's hypothetical question omitted any medical evidence that accurately reflected the claimant's impairments, the record indicated that the vocational expert had reviewed the medical records before testifying. *Id.* Third, "[t]he hypothetical question posed by the ALJ was proper because it reflected [the claimant's] impairments to the extent that the ALJ found them supported by evidence in the record." *Id.*

The third of these three independent bases is present here. The hypothetical question upon which the ALJ relied incorporated the limitations that the ALJ found credible. It did not include Ms. Caviness's subjective complaints that he did not find credible. If the ALJ's step-four findings are valid, that approach is entirely appropriate. However, the vocational expert's testimony in this case

shows how important it is for an ALJ to make an RFC determination supported by substantial evidence. If Ms. Caviness's claimed need for periodic absences from work is credited, the vocational expert would probably conclude that she is unlikely to be able to find or hold a job. If on remand the Commissioner finds that Ms. Caviness's limitations are more severe, any additional restrictions on her functional capacity must be considered in evaluating whether she is capable of performing a significant number of jobs in the economy.

### Conclusion

Whether Ms. Caviness is actually disabled for purposes of the Social Security Act is a question this court neither could nor should answer. The ALJ did not err by finding that Ms. Caviness's impairments do not meet or equal the Listings, but his decision to discredit Ms. Caviness's subjective complaints was based on several omissions and mischaracterizations of significant and material evidence and therefore must be set aside. The Commissioner needs to take a closer look at the evidence in support of and weighing against Ms. Caviness's subjective complaints in determining her residual functional capacity. Accordingly, the decision of the Commissioner is VACATED and the case REMANDED for further proceedings consistent with this opinion. Final judgment will be entered immediately.

So ordered.